UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

WILLIAM H. BOLIA,

                    Plaintiff,                    REPORT AND
                                                  RECOMMENDATION
          v.
                                                  02-CV-6510(T)

MERCURY PRINT PRODUCTION, INC.,

                    Defendant.

---

## Preliminary Statement

Currently before the Court is a motion by plaintiff's former
attorney William Burkhart, Jr. ("Burkhart") to fix the amount of
attorney's fees, if any, owed to him by his former client, William
Bolia ("Bolia").  (Docket #185).  Burkhart contends that he was
discharged from representation without cause by Bolia, and
therefore, pursuant to Section 475 of the New York Judiciary law,
is entitled to attorney's fees on a quantum meruit basis for work
performed prior to his discharge.  Bolia contends that Burkhart was
discharged for cause and accordingly, is not entitled to any fees.

By Order of Judge Michael A. Telesca dated February 17, 2006,
the matter of Burkhart's fee application was referred to me
pursuant to 28 U.S.C. §636(b)(1)(A)-(B) for a hearing and a Report
and Recommendation.  (Docket #194).  Pursuant to that Order, I
conducted a hearing on March 10, 2006, at which Bolia, Burkhart,
and plaintiff's current attorney, Steven Modica, testified.  The

following is my Report and Recommendation as to Burkhart's application for attorney's fees.

## Factual Background

On October 4, 2002, plaintiff William Bolia, represented by attorney William Burkhart, Jr., brought this action against his former employer, defendant Mercury Print Production, Inc., claiming that the defendant discriminated against him on the basis of his age and disability, and that Mercury had violated certain of his rights under the Employee Retirement Income Security Act ("ERISA"). Prior to bringing the federal action, and as required by law, Bolia brought an administrative action against the defendant before the New York State Division of Human Rights. Bolia, who was represented by Burkhart during the administrative proceedings, requested that the administrative action be dismissed so that he could commence the instant action in federal court.

After Bolia filed his complaint in this Court, and upon completion of discovery in this case, Mercury moved for summary judgment against Bolia on all claims. By Order dated March 21, 2005, Judge Telesca dismissed two of the seven claims against the defendant, but allowed plaintiff's discrimination and ERISA claims to proceed to trial.

On December 7, 2005, the parties appeared for a settlement conference before Judge Telesca. Attorneys Burkhart and Irving

Pheterson, ("Pheterson"), an attorney who had recently been retained by Burkhart to act as trial counsel, appeared on behalf of Bolia. Defendant was represented by attorneys J. Michael Wood and Jerry Greenfield. During the settlement conference, Judge Telesca met with all counsel and then privately with each side to encourage settlement. According to Judge Telesca, the parties' ability to negotiate a resolution to the case was impeded by Burkhart's conduct during the settlement conference, and more specifically, Burkhart's insistence that he was entitled to be paid in full for $160,000 in accrued legal fees as part of any settlement. The day following the settlement conference, Judge Telesca wrote a letter to Burkhart and Pheterson[1] which expressed his "personal concern" over Burkhart's conduct during the settlement conference. Judge Telesca wrote:

> I will get right to the point. During settlement negotiations, Mr. Burkhart was adamant that he is entitled to a fee of $160,000 for services performed thus far on this case. . . . In an attempt to establish a reasonable settlement demand, the amount of Mr. Burkhart's fee was always paramount and uncompromising throughout our discussions. Effectively, the settlement demand starts at $160,000 to satisfy Mr. Burkhart's fee which places the plaintiff's recovery certainly in a secondary position of importance. I am troubled by this attitude because an attorney's only ethical obligation is to serve his client loyally and competently, without

---

[1] Judge Telesca sent the letter only to plaintiff's counsel since his concerns involved "statements made principally by Mr. Burkhart during settlement negotiations." See Hearing Exhibit 5.

> allowing his own financial interests to influence his actions.

See Hearing Exhibit 5

In his letter, Judge Telesca also questioned whether the plaintiff has "a clear understanding that he is obligated to pay Mr. Burkhart $160,000 for services rendered to date." Judge Telesca directed plaintiff's counsel to advise the Court in writing what plaintiff's understanding is "concerning the fee arrangement."

In response to Judge Telesca's letter, attorney Pheterson, who had not received any compensation for his services, voluntarily withdrew from representing the plaintiff, and expressly disclaimed any right or interest in any fee. In his December 8, 2005 letter to Judge Telesca, Mr. Pheterson stated:

> In view of the circumstances, and Your Honor's letter, _the contents of which I agree with_, I have come to the conclusion that it would be best, _since Mr. Burhart insists on his fee, in full, regardless of the amount of any settlement that might be made which would be in Mr. Bolia's best interest_, that I be relieved as attorney in this case representing the plaintiff with Mr. Burkhart, and I make this letter as my formal request to be so relieved.

See Hearing Exhibit 4 (emphasis supplied). Mr. Pheterson sent a copy of his letter withdrawing from representation and a copy of Judge Telesca's December 8, 2005 letter to Bolia.

After receiving Pheterson's letter, Bolia stated that he was "flabbergasted" and that he had "no idea" that Mr. Burkhart had generated $160,000 in legal fees. Unable to sleep, the next day

Mr. Bolia called Judge Telesca directly in order to ask for advice on how he should proceed. Judge Telesca did not give Bolia substantive advice, but suggested that Bolia speak to an attorney, and offered Bolia the names of four different attorneys experienced in employment litigation matters. Bolia contacted attorney Steven Modica ("Modica"), and following a consultation, retained Modica, who agreed to represent the plaintiff pro bono. On December 22, 2005, Judge Telesca ordered the substitution of counsel and Burkhart was terminated from his representation of Bolia. (Docket #182). On December 23, 2005, the parties appeared before Judge Telesca for a second settlement conference, during which the parties successfully negotiated a resolution of the case. Under the terms of the settlement agreement, defendants agreed to pay Bolia $60,000.00. Pursuant to the settlement agreement, the case was dismissed on December 28, 2005.

Two days later, on December 30, 2005, attorney Burkhart filed a notice of lien against the settlement proceeds pursuant to Section 475 of the New York Judiciary Law. According to the notice, and a subsequently filed motion to enforce the lien, Burkhart claims that he was dismissed by his client without cause, and therefore, is entitled to a lien on settlement proceeds in the amount of $131,715.22, representing $127,540.00 in fees, and $4,155.22 in expenses. Burkhart subsequently amended that request, and seeks $130,720.49, representing $126,720.00 in fees, $872.27 in

costs, and $3,282.95 in unpaid expert witness fees. Burkhart contends that the fees are reasonable based on an hourly rate of $200.00. Plaintiff opposes Burkhart's motion on grounds that since Burkhart was dismissed for cause, he is not entitled to any attorney's fees.

## Discussion

### I. Jurisdiction

Section 475 of the New York Judiciary law provides in relevant part that an attorney who appears on behalf of a party retains a lien on his client's cause of action which attaches to a verdict or other final judgment in his client's favor. Section 475 also provides that an attorney may petition a court to enforce the lien. Although Section 475 is a provision of New York State law, federal courts are obligated to determine, and where appropriate, enforce a lien sought pursuant to Section 475. See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 449 (2nd Cir. 1998)(district court's refusal to consider attorney's petition pursuant to § 475 following resolution of the parties' litigation constituted reversible error); Allstate Ins. Co. v. Nandi, 230 F.Supp.2d 515, 517 (S.D.N.Y. 2002)(decision to fix fees is within the court's ancillary jurisdiction). Accordingly, this Court retains jurisdiction to determine the amount of fees, if any, to which Burkhart is entitled.

II.  Legal Standards Governing Fee Disputes involving
     Discharged Attorneys

Although it is well established that a client may terminate
his relationship with his attorney at any time and for any reason,
if the client terminates the relationship without cause, the
discharged attorney is entitled to compensation for legal services
rendered on behalf of the client prior to the discharge.  Jacobson
v. Sassower, 66 N.Y.2d 991 (1985).  If, however, the client
terminates the relationship for cause, the discharged attorney is
not entitled to any compensation for services rendered to the
client.  Universal Acupuncture Pain Services P.C. v. Quadrino &
Schwartz, P.C., 370 F.3d 259 (2nd Cir. 2004); Casper v. Lew
Lieberbaum & Co., Inc., 182 F.Supp.2d 342, 346 (S.D.N.Y. 2002);
Campagnola v. Mulholland, Minion & Roe, 76 N.Y.2d 38, 44 (1990).
This is true regardless of whether or not the attorney and client
were parties to a retainer agreement.  O'Connor v. Spencer (1977)
Inv. Ltd. Partnership, 8 Misc.3d 658, 659 (N.Y. Sup. 2005);
Allstate Ins. Co. v. Nandi, 258 F.Supp.2d 309, 311 (S.D.N.Y. 2003).

In cases where a client has discharged his attorney, the
discharged attorney may petition the court for a determination of
the fees (if any) that are owed by the client to the attorney.
Upon the filing of such a petition, it is the attorney's
responsibility to demonstrate that the fees sought are fair and
reasonable.  O'Connor v. Blodnick, Abramowitz and Blodnick, 295
A.D.2d 586, 587 (2d Dept. 2002).  Where a client claims that no

fees are owed to the attorney because the attorney was discharged for cause, the client must establish that there was just cause for terminating the relationship. DeLuccia v. Village of Monroe, 180 A.D.2d 897, 899 (3d Dept. 1992).

To establish that an attorney was discharged for cause, the client must generally demonstrate that the attorney has significantly breached a legal or professional duty owed to the client. Allstate Ins. Co. v. Nandi, 258 F.Supp.2d at 312; Cruz v. Olympia Trails Bus Co., 2002 WL 1835440, *4 (S.D.N.Y. 2002). A client may also establish cause for discharging an attorney by demonstrating that the attorney failed to properly represent his or her interests. Costello v. Kiaer, 278 A.D.2d 50 (1st Dept. 2000). Mere dissatisfaction with an attorney's strategic judgment, however, may not be sufficient to establish termination for cause. Id. at 50. Similarly, general allegations that an attorney was discharged because of personality conflicts or unspecified billing problems are generally insufficient to establish that an attorney was discharged for cause. Allstate Ins. Co. v. Nandi, 258 F.Supp.2d at 312.

III. Plaintiff has established that Burkhart was discharged with cause.

Bolia contends that he discharged Burkhart from representation following the December 7, 2005 settlement conference because he believed that Burkhart had put his own financial interests ahead of

Bolia's, because Burkhart failed to keep him informed of the substantial fees that Burkhart had billed in prosecuting the case, and because Burkhart's fees were excessive.

Burkhart denies plaintiff's claims, and contends that he never placed his own financial interests ahead of Bolia's during the prosecution of the case; that he kept Bolia informed of his fees; and that his fees were reasonable, and in fact, were below market rate. He contends that his insistence on the entirety of his fee at the settlement conference was a negotiating tactic designed to elicit a favorable settlement offer from the defendant. He further contends that while he did not submit written bills or statements to Bolia, he nevertheless kept Bolia aware of the substantial fees that were accruing as a result of three years of contentious litigation.

Based on the record before me, including the parties' written submissions, hearing exhibits, and the testimony received at the March 10, 2006 hearing, I find that plaintiff has established good cause for discharging Burkhart from representation, and therefore, I recommend that Burkhart's fee application be denied.

A.   <u>Burkhart placed his own interests ahead of Bolia's in violation of his duty of loyalty to Bolia.</u>

Bolia claims that Burkhart placed his own interests ahead of Bolia's by conditioning settlement of the case upon Burkhart's receipt of the full amount of attorney's fees that he had charged

in the case, which at the time, Burkhart estimated to be in excess of $160,000.00. Bolia contends that Burkhart's insistence that he receive the full value of his accrued fees prejudiced any potential settlement of his case, and clearly demonstrated that Burkhart's interest in his fees was greater than his interest in Bolia's ability to resolve the litigation in a manner satisfactory to Bolia.

Because the relationship between the lawyer and a client is a unique and special one, the law imposes stringent standards of behavior on attorneys who have undertaken representation on behalf of a client.  See In re Dunn, 205 N.Y. 398, 401-402 (1912) ("That the relationship between attorney and client is one of an unusual character has been so often affirmed that a statement of the proposition is commonplace"); Matter of Cooperman, 83 N.Y.2d 465, 472 (1994)(because of attorney's unique position of giving counsel to a client, the lawyer's obligations to his client "transcend those prevailing in the commercial market place").  Perhaps the most essential duty owed by an attorney to his client is the duty of undivided loyalty.  Dunn, 205 N.Y. at 402 (foundation of the attorney-client relationship is the client's trust in his attorney and the attorney's "undivided loyalty and devotion" to his client).

As part of an attorney's duty of loyalty to his client, the attorney is ethically obligated to put the client's interests ahead of his own.  "The duty to deal fairly, honestly and with undivided

loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including . . . honoring the clients' interests over the lawyer's." Cooperman, 83 N.Y.2d at 472 (citations omitted).  Indeed, "it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect.  This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989)(internal citation omitted).  The duty to avoid self-dealing often applies with special force in the context of a settlement negotiation, where the lawyer is ethically bound to advise his client on the basis of his professional judgment, and may not allow his interest in a legal fee to influence the advice given.  Evans v. Jeff D., 475 U.S. 717, n. 8 (1986)(citing the American Bar Association Model Code of Professional Responsibility EC 5-1, EC 5-2, DR 5-101(A) (1982)).  See also New York Code of Professional Responsibility DR 5-101 ("A lawyer shall not accept or continue employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests . . . ").

Here, I find the evidence compelling that Burkhart put his own financial interests ahead of his client's interests when he insisted on full payment of his legal fees as part of any potential settlement agreement.   Bolia testified at the March 10, 2006 hearing that at the time of the December 7, 2005 settlement conference, he wanted to settle the case.   He had compelling reasons to do so.   Since the inception of the federal lawsuit in the fall of 2002, Bolia's physical and financial health deteriorated significantly.   In 2003, he was diagnosed and treated for radical prostate cancer.   In January 2005, he underwent back surgery.   In September 2005, a serious heart condition required the insertion of an arterial stent.   He has recently been diagnosed with two broken discs in his back, as well as a suspicious tumor, and will be undergoing surgery soon to address those conditions. His financial circumstances at the time of the conference with Judge Telesca were acute as well.   Bolia testified that certain rental property that he owned had been foreclosed upon because of his inability to make tax payments.   He testified that he has heavy credit card debt, and that there are currently two mortgages on his home.   Because of his physical and financial condition, I find Bolia's testimony that he wanted to settle his action credible.[2]

---

[2]   My finding with respect to Bolia's credibility is not disputed by Burkhart who states in his post-hearing memorandum: "Mr. Bolia, in his testimony, presented a very sympathetic picture of a man in distress. He lost his job, became ill, apparently needed surgery, and clearly wanted the litigation to end." See Petitioner's Brief at page 1.

Moreover, I find that Burkhart was aware of his client's medical and financial circumstances. Indeed, in his December 15, 2005 letter to Judge Telesca defending his conduct, Mr. Burkhart acknowledged that "[d]ue to the loss of his career and subsequent physical disability" he considered Bolia "to be in considerable financial distress." <u>See</u> Hearing Exhibit 6. In addition to his client's personal plight and hardship, Burkhart was also apparently aware of legal precedent in the Second Circuit that threatened to extinguish most of Bolia's economic damage claims for back and front pay. <u>See</u> <u>Saulpaugh v. Monroe Community Hospital</u>, 4 F.3d 134, 145 (2d Cir. 1993)(plaintiff not entitled to back and front pay damages where unable to work because of disability), <u>cert.</u> <u>denied</u>, 510 U.S. 1164 (1994).[3]

Though aware that his client's situation required serious efforts to settle the litigation in December 2005, Burkhart's conduct at the December 7, 2005 settlement conference clearly supports a finding that he subordinated Bolia's need to settle the litigation to his own desire to receive the full amount of his claimed fees. I find that Burkhart's insistence that his legal fees be paid in full as part of any settlement made it impossible for Burkhart to separate his own pecuniary interest from the overwhelming interest of his client in settling the case. That

---

[3] Despite the risks the <u>Saulpaugh</u> precedent presented, Burkhart informed Judge Telesca during the settlement conference that he valued Bolia's case at $500,000, <u>not</u> <u>including</u> his attorney fees and costs.

Burkhart put his own self interest in getting paid over his duty of loyalty to his client was corroborated not only by the letters of Judge Telesca and Mr. Pheterson describing Burkhart's conduct, but was confirmed by Burkhart's own hearing testimony.   Burkhart claimed that during the settlement conference, Judge Telesca himself suggested a settlement amount of $150,000.   When this Court asked Burkhart whether he would have recommended that his client accept such a settlement if offered, Burkhart's answer was revealing.  He testified that he would have advised his client that $150,000 was "not sufficient," but that if his client instructed him to accept it, all of the settlement amount would be applied towards his outstanding legal fees and Mr. Bolia would be required to pay any additional deficiency.  Put simply, Mr. Bolia would get nothing.  Burkhart saw no ethical concerns about such a result, repeatedly testifying that he "needs to earn a living the same as anyone else."   Perhaps most remarkable about Burkhart's hearing testimony was the fact that he never acknowledged the hardship that his insistence on receiving his full measure of fees would have caused his client.  By 2005, the prosecution of Bolia's lawsuit was not being driven by the merits of the case or the risks of trial, but by Burkhart's ever mounting legal fees.   In sum, I find that Burkhart's testimony betrayed a greater allegiance to his own financial gain than to his client's interests.

B.    Failure to keep client informed of accrued fees

Bolia advances as an additional rationale for his discharge of
Burkhart the fact that during the entire course of the litigation,
which lasted more than three years, Burkhart, in violation of the
parties' retainer agreement, never kept him appraised of the fees
that Burkhart was accruing.  Bolia testified at the March 10, 2006
hearing that Burkhart never sent him a bill or statement, and
therefore, he had no idea that Burkhart had charged well over
$100,000.00 in attorney's fees and costs.  Bolia testified that he
did not learn that he allegedly owed Burkhart over $150,000.00
until receiving Pheterson's letter (with Judge Telesca's letter
attached) after the December 7, 2005 settlement conference.  Bolia
testified that once he learned of the amount he purportedly owed,
he discharged Burkhart for, inter alia, failing to keep him
informed of the amount of the fees owed.  In contrast, Burkhart
contends that at the time of the December 2005 settlement
conference, Bolia was aware of the substantial amount of fees and
expenses that had accrued throughout the litigation.[4]

_____

[4]  While Burkhart disputed Boila's claim that he first learned of
Burkhart's $160,000 in legal fees when reading Judge Telesca's letter,
he conceded that it was not until late 2005 that he told Boila how high
his legal fees had become.  According to Burkhart, shortly before the
December settlement conference with Judge Telesca, he asked Mr. and Mrs.
Boila to come to his office to meet Mr. Pheterson.  During this meeting,
Burkhart recalled telling the Bolias that he had over $225,000 "invested
in this case" and that Boila would be responsible for these fees win or
lose.  Burkhart admitted in his hearing testimony that at the time he
made this representation, he had never calculated his fees and his
statement of the total fees owed was "an estimate."

I find that plaintiff was justified in discharging Burkhart for failing to inform him of the substantial fees and costs that were accruing in this case for over three years throughout the litigation.   It is uncontroverted that Burkhart never sent Bolia a statement or bill during the entire three years and two months of the federal litigation, despite the fact that the retainer agreement entered into by the parties required Burkhart to calculate and bill fees on a monthly basis.   Burkhart, who relies on the retainer agreement as the basis for his claim of entitlement to over $130,000.00 in attorney's fees, testified that he did not abide by that provision of the agreement because he was "stupid," and that he thought he was doing Bolia "a favor" by not keeping him informed of the growing attorney's fees.   Burkhart further offered that had he billed Bolia on a regular basis, and had Bolia failed to pay those bills, the non-payment would have created a conflict between him and his client, and he would have then been required to "drop" his representation of Bolia.

I find Burkhart's final explanation of his reason for not keeping Bolia informed of the mounting costs of the litigation to be disingenuous at best.   There is no reason why Burkhart could not have kept the plaintiff informed of the growing litigation costs without demanding or expecting immediate payment of his attorney's fees.   In his hearing testimony, Burkhart conceded that the retainer agreement he drafted required monthly billing statements

to be sent to Mr. Bolia.  If Burkhart recognized that by informing
Mr. Bolia that he had amassed a debt of over $150,000 in unpaid
legal fees would "create a conflict" sufficient to require his
withdrawal, it is difficult to comprehend how Burkhart could
credibly believe deliberately concealing the debt from his client
cured, let alone avoided, that conflict.

     Moreover, it appears that Burkhart himself did not even keep
an accurate running total of his fees during the course of the
litigation.   Unlike the prosecution of Bolia's administrative
complaint, during which Burkhart presented Bolia with reasonably
detailed monthly statements documenting the work performed during
the billing period, Burkhart did not maintain or compile monthly
statements throughout the entire three-year period of the federal
litigation.  Rather, Burkhart testified that he kept track of the
time spent on Bolia's case on handwritten time slips, and that he
never compiled a total of his time on either a monthly or yearly
basis.   Indeed, the only time that Burkhart prepared a billing
statement was after his discharge.  Accordingly, it is evident from
the record that not only did Burkhart fail to inform Bolia of the
accruing costs of the litigation, he failed to even keep track of
the costs.

     Not only did Burkhart fail to maintain a record of his fees,
Burkhart also failed to maintain a written accounting of expenses
that were charged to and paid by Bolia throughout the three year

federal litigation.   Under the terms of the retainer agreement, Bolia was responsible for paying certain expenses, including expert witness fees, and transcript and court reporter fees.   Bolia testified that rather than receiving bills for ongoing expenses, Burkhart would call him and ask for a check to cover unspecified costs.   Bolia was given no written statement of the expenses, and received no receipt for expenses paid.   Burkhart acknowledged that he did not keep an accounting of the payments he received from Bolia for payment of ongoing expenses, but claimed that his bookkeeping procedures necessitated only the maintenance of a handwritten, internal receipt recording the date and amount of  any payment received.

Burkhart contends that his failure to provide monthly bills to his client as required by the retainer agreement is a de minimus breach of that agreement, and does not constitute just grounds for discharging him from representation.   In support of this contention, Burkhart cites King v. Fox, 2005 WL 3098933 (S.D.N.Y. Nov. 18, 2005), in which the court held that irregular billings in contravention of a retainer agreement could not justify discharging an attorney for cause where the practice of irregular billing had been long established and accepted by the client.   In this case, however, Bolia *never* received a billing statement, and thus, I find the holding in King to be inapplicable to the facts here.   I find that Burkhart's failure to inform Bolia of the mounting fees

generated by the litigation; failure to provide written documentation supporting his requests for payment of expenses; and failure to provide Bolia with receipts for payments made to constitute a material breach of the retainer agreement, which provided just grounds for discharging Burkhart from representation. See New York Code of Professional Responsibility DR 9-102(C)(3) ("A lawyer shall maintain complete records of all funds . . . of a client . . . coming into possession of the lawyer and render appropriate accounts to the client"); see also Realuyo v. Diaz, 2006 WL 695683, *14-15 (S.D.N.Y. March 17, 2006)(where attorney violated Disciplinary Rules in connection with his representation, failed to keep any contemporaneous time records, and never submitted a bill to client, court denied his quantum meruit application).  This is so not just because Burkhart failed to comply with the clear requirement of the retainer agreement, but because the failure to keep Bolia apprised of the mounting fees and expenses deprived Bolia of information necessary to make an informed decision as to whether he should settle the case or proceed to trial.  Because the amount of the fees and costs had become so large, and because Burkhart was unwilling to compromise his fees, the amount of the fees became a factor that could significantly affect the course of the litigation.  Moreover, once he finally did learn of his enormous potential liability to his attorney, and his attorney's unwillingness to accept anything less

than the full value of the fees billed, Bolia was effectively
forced to proceed to trial (against his wishes) because trial
provided the only possibility for repaying the debt he now owed his
attorney.   Had Bolia been informed on a consistent and ongoing
basis that his potential liability to his attorney was growing to
such a large amount, he would have been able to choose the course
of the litigation with full knowledge of the economic consequences
of his decisions.   Accordingly, I find that Burkhart's failure to
inform Bolia of the accruing costs of the litigation constituted a
material breach of the retainer agreement, and justified Bolia's
discharge of Burkhart from further representation.

### C.   Excessive Fees

Finally, Bolia contends that he was justified in discharging
Burkhart for cause because Burkhart's fees were excessive.
Although Bolia had not been provided a billing statement or invoice
by Burkhart at any time during the three-year litigation, Bolia
came to learn for the first time in December, 2005 that Burkhart
had charged approximately $160,000.00 in fees to Bolia, and that
win, lose or settle, he would be obligated to pay Burkhart at least
that amount.   Because I find that Burkhart (1) violated his duty of
undivided loyalty to his client by failing to subordinate his own
interests in legal fees to the interests of his client in settling

the case and (2) materially breached the retainer agreement, I need not determine whether Burkhart's fees were excessive.[5]

## Conclusion

It is my Report and Recommendation that attorney Burkhart's fee application be **denied** on grounds that Burkhart placed his personal interest in collecting a fee ahead of his client's desire to obtain a fair and reasonable settlement and failed to keep his client informed of the fees and expenses he was charging his client in violation of the parties' retainer agreement. Furthermore, because Burkhart, throughout the course of the litigation, failed to provide written statements or receipts detailing the expenses for which Bolia was charged and which Bolia paid, I find that Burkhart has failed to establish that he is entitled to payment of expenses that he claims remain unpaid. Accordingly, it is my Report and Recommendation that the full amount of the settlement proceeds currently held in escrow by Attorney Steven Modica be

---

[5] Nevertheless, and for purposes of completeness, I note that Bolia had reason to believe that Burkhart charged him excessive fees. Without reviewing each and every item listed in Burkhart's 44 page invoice dated January 16, 2006 (amended on March 10, 2006), I find it troubling that over the course of the litigation, Burkhart charged over $60,000 in legal research fees (for almost 300 hours of time) in a case involving a single plaintiff alleging routine ERISA, age and disability discrimination claims against a single employer. Although he has never tried a case in either state or federal court, Burkhart considers himself to be an expert in labor and employment law, and testified that he devotes his practice almost exclusively to employment issues. According to Burkhart's time records, he spent approximately 665 hours prosecuting the case over the course of three years. It is puzzling that an expert practitioner would need to spend almost 50% of the total time billed in researching the law.

released to Bolia, and that any funds currently held in trust by Burkhart be returned to Bolia.


**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: May **16**, 2006
      Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

    **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

    **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R. Civ.P. 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3(a)(3).

    The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

    **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

    The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

    Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated: May 16, 2006
Rochester, New York